FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 MAR 26 AM 9: 54

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| TONYA L. SMOTHERS | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | CV-97-J-2774-S |
| BIRMINGHAM-SOUTHERN COLLEGE | ) | |
| Defendant, | ) | |

ENTERED

MAR 2 6 1999

## MEMORANDUM OPINION

The issue before the court is whether defendant Birmingham-Southern College ("BSC") is entitled to summary judgment on plaintiff's claim for discrimination in employment on the basis of her religion in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e-1, *et seq.* For the reasons expressed below, the defendant's motion with respect to the religious discrimination claims is due to be granted.

## BACKGROUND FACTS[1]

Plaintiff Tonya Smothers ("Smothers") was a student at BSC, a private liberal arts college affiliated with the United Methodist Church ("UMC"). Upon her graduation in 1991, BSC employed Smothers as an assistant in the library and in the language laboratory. In 1993, Smothers applied for and was awarded the position of Coordinator of 'Southern Volunteer Services. 'Southern Volunteer Services ("SVS") is an innovative program that offers students an opportunity to learn through service to others. Smothers's immediate supervisor became Dr. Stewart Jackson, who has been the

---

[1] In considering defendant's motion, the court has given the plaintiff the benefit of all logical inferences from the evidence presented by the parties. The recitation of facts herein is based upon the evidentiary materials presented by the parties viewed in the light most favorable to the plaintiff.



Chaplain of BSC for 19 years. Dr. Jackson is an ordained United Methodist minister, and is a full-time employee of the College. At the end of the 1995-96 academic year, Smothers's appointment was not renewed for the following year. In the present action, Smothers alleges that BSC did not renew her appointment because of her religion, which she defines as agnostic.

## ANALYSIS

Title VII of the Civil Rights Act of 1964 generally prohibits discrimination in employment on the basis of religion unless the employer is unable to reasonably accommodate the employee's religious observance or practice without undue hardship on the conduct of the employer's business. 42 U.S.C. § 2000e-2(a), 2000e(j). Title VII provides, however, that certain religious entities are not subject to this prohibition against religious discrimination. 42 U.S.C. § 2000e-1(a), 2000e-2(e)(1) and (2). BSC claims entitlement to these two exemptions from the prohibition against religious discrimination.

### THE SECTION 702(a) EXEMPTION

Section 702(a) of Title VII provides an exemption for religious educational institutions from Title VII's religious discrimination prohibition. That provision reads as follows:

> This subchapter shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1. In determining whether an institution is a "religious organization" entitled to the § 702(a) exemption, the EEOC, exercising Congressionally-mandated expertise, focuses on the following factors: (1) whether the institution was created to serve a religious purpose, and (2) whether its purpose has remained unchanged. *Decision 83-16,* 31 F.E.P. Cases 1858, 1869

(1983). Based upon the undisputed facts, viewed in the light most favorable to the plaintiff, the court finds that BSC passes this test.

BSC's predecessor institutions were founded by assemblies of the United Methodist Church. BSC traces its roots to three events in the history of the UMC in Alabama: the founding of Southern University in Greensboro, Alabama, in 1856; the opening of North Alabama Conference College (later called "Birmingham College") in 1889; and the merger of the two institutions in 1918 to form Birmingham-Southern College. In 1854, the Alabama Conference of the Methodist Episcopal Church approved a resolution to establish a college at Greensboro, Alabama. In 1855, the Alabama Conference appointed Trustees for the college, and named a committee to secure a charter from the State of Alabama for "the Southern University." An Act of the Alabama General Assembly dated January 25, 1856, incorporated Southern University in the name of the trustees chosen by the Alabama Conference of the United Methodist Church. The State was later divided into two Methodist conferences, the Alabama Conference and the North Alabama Conference. In 1896, the North Alabama Conference approved the establishment of a second institution near Birmingham called the North Alabama Conference College, and that College (later called "Birmingham College") opened on September 14, 1898. In 1917, the two conferences agreed to merge Birmingham College and Southern University. Birmingham-Southern College began operating in September 1918.

Birmingham-Southern College characterizes itself and holds itself out to students, faculty and the world as a religious educational institution. The first substantive sentence in its Catalog reads as follows:

> Type of college: four-year collegiate liberal arts institution founded in 1856 and operating under the auspices of the Alabama-West Florida and North Alabama Conferences of the United Methodist Church.

.

3

BSC's Mission Statement states as follows: "Birmingham-Southern College operates under the auspices of the Alabama-West Florida and the North Alabama Conferences of the United Methodist Church. The College's most responsible service on behalf of the Church is to perform with distinction its educational mission." The College's By-Laws also state the religious purpose of the College:

> Birmingham-Southern College is a liberal arts college of the United Methodist Church, committed to the maintenance on its campus of an atmosphere conducive to the developing and maturing of Christian faith and character; to the advancement of learning in all lines of truth; to a defense of scholarship against false notions and ideals; and to a contribution to the Church and to the State of those men and women who identify with the College and who will move into society's mainstream to provide the greatest possible measure of service.

The President of BSC characterizes the educational mission of the College as providing education to educate "an atmosphere conducive to the developing and maturing of Christian faith and character." The Christian purpose of the College was recently recognized by its inclusion as one of only 87 institutions in an independent publisher's list of "America's Best Christian Colleges."

There is evidence that the College not only speaks its religious mission, but also engages in actions fulfilling that mission. The President is the direct supervisor of the Chaplain of the College, Dr. Jackson, and the Chaplain submits monthly reports of his activities to the President. The Chaplain conducts a chapel service each Monday night. There are also Baptist, Episcopal and Roman Catholic chapel services on campus each week. BSC sponsors two programs that send BSC students to area churches to speak, produce youth programs, and provide other services. BSC provides a yearly monetary stipend to participants in Youth Ambassadors, a religious program. The Concert Choir also gives students the opportunity to perform in local churches.

BSC offers majors in Religion, and provides a pre-ministry program to assist those students preparing for full-time ministry and church service. In the 1997-1998 academic year alone, BSC students received a total of $510,132.00 in financial aid directly related to religion or religious affiliation. Students who major in religion or intend to be ordained into the ministry or full-time Christian service may be eligible to receive a fifteen percent tuition scholarship per academic year. Children of ordained ministers in the United Methodist Church are granted a twenty-five percent tuition scholarship each year. Forty-two percent of all BSC students enrolled during the past academic year are United Methodists. This is the highest percentage of United Methodist students attending any United Methodist college in the United States.

BSC sponsors annual continuing education programs for United Methodist ministers. In addition, BSC sponsors the Lay Pastor's School of the North Alabama Annual Conference of the UMC. All ordained ministers of the UMC in the North Alabama Conference who have not completed a seminary degree are required to attend the Lay Pastor's school four times per year. In addition, BSC's Office Of Church Relations has been designated by the Church to take responsibility for approving continuing education courses for all United Methodist Ministers in the North Alabama Annual Conference and for keeping the continuing education records for those ministers.

These facts lead to the conclusion that BSC is a religious educational institution. Plaintiff argues, however, that BSC is not sufficiently doctrinaire or sectarian to render it a religious educational institution. As evidence, plaintiff points to the fact that the College allows Roman Catholic, Baptist and Episcopalian services to be held on its campus. The mere fact that the Methodists may approach religion in an ecumenical spirit or tolerate the existence of different faiths among its students does not detract from the undisputed evidence that demonstrated the religious

5

history, purpose and character of the College. The Eleventh Circuit has found that an institution need not be rigidly sectarian or intolerant of other religions or beliefs in order to qualify as a religious educational institution. *Killinger v. Samford University*, 113 F.2d 196, 198-199, n.1 (11th Cir. 1997)(hereinafter "*Killinger*").

The statutory language and legislative history show that the plaintiff's employment is encompassed by BSC's § 702(a) exemption. While there may be room to debate whether Smothers's job was of a religious nature, the § 702(a) exemption does not limit itself to employment of a religious nature. As originally enacted in 1964, the § 702(a) exemption applied only to the "religious activities" of the institution. The 1972 amendment to Title VII expanded this exemption to cover all activities of religious institutions. Pub. L. 92-261. Section 702(a) now allows a religious educational institution to prefer a person of a particular religion "to perform work connected with the carrying on by such . . . educational institution . . . of its activities." 42 U.S.C. § 2000e-1(a). The legislative history of the 1972 amendment further indicates that the exemption applies to all activities of the educational institution. 118 Cong. Rec. 1994, 1982 (1972) (Comments of sponsors Senators Allen and Ervin).

Plaintiff argues that BSC is not entitled to the exemptions because there is a single statement in its policy manual stating that it does not discriminate against individuals on the basis of religion in recruiting, hiring, or promotions. Such a statement does not a secular institution make; the Eleventh Circuit rejected the same argument in *Killinger*. In *Killinger*, the plaintiff argued that the alleged religious discrimination by the Dean was not exempt from Title VII because it was contrary to Samford's official policies. The Eleventh Circuit rejected that argument, holding as follows: "We are also aware of no requirement that a religious educational institution engage in a strict policy of

religious discrimination – such as always preferring Baptists in employment decisions – to be entitled to the exemption." *Id.* at 199-200. Similarly, in *Hall v. Baptist Memorial Health Care Corp.*, No. 98-CV-2035-DA (W.D. Tenn. Nov. 23, 1998)(order granting defendant's motion for summary judgment), the plaintiff argued that the defendant had waived the religious exemption because it held itself as an "equal opportunity employer" in its advertisements, employee handbook, policy manual, and mission statement. The court, relying on *Killinger*, found that the religious exemption from Title VII could not be waived, and the use of the term "equal opportunity employer" could not negate the exemption. *Id.* p. 14-15. *See also, Liao v. Tennessee Valley Authority*, 867 F.2d 1366 (11th Cir. 1989) (violation of defendant's policy -- an affirmative action plan -- cannot create a Title VII cause of action where the conduct is not otherwise a Title VII violation).

Plaintiff relies upon *EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir. 1989) in arguing that the § 702(a) exemption does not apply to BSC. However, *Mississippi College* is entirely consistent with this court's holding. The challenged practice in *Mississippi College* was not religious discrimination, but sex discrimination. The Eleventh Circuit held that, had religious discrimination been charged against that religious educational institution, the college would not have been subject to suit. "[T]o the extent that this employment practice [preference for particular Christian denomination] is based upon religious discrimination, § 702 exempts it from the application of Title VII." *Id.* at 485 n.10. *See also, Little v. Wuerl*, 929 F.2d 944 (3d Cir. 1991); *Scharon v. St. Luke's Episcopal Presbyterian Hospital*, 929 F.2d 360 (8th Cir. 1991); *Maguire v. Marquette University*, 627 F. Supp. 1499, 1505-07 (ED Wis. 1986), *dismissal affirmed, opinion vacated on other grounds*, 814 F.2d 1213 (7th Cir. 1987).

7

Because plaintiff has not presented sufficient evidence to cast a substantial doubt upon BSC's characterization of itself as a religious educational institution, the court finds that § 702(a) exempts it from suit under Title VII alleging religious discrimination in employment.

### THE SECTION 703(e)(2) EXEMPTION

Section 703(e)(2) of Title VII provides that it shall not be an unlawful employment practice:

> for a school, college, university or other educational institution . . . to hire and employ employees of a particular religion if such . . . university . . . is in whole or in substantial part, owned, supported, controlled or managed by a particular religious corporation, association or society . . . .

42 U.S.C. § 2000e-(2)(e). BSC claims that it is not subject to suit for religious discrimination in employment because it is in substantial part, owned, supported, controlled or managed by a particular religious corporation, association or society. Whether an institution is entitled to the §703(e)(2) exemption is a question of law to be determined by the court. *See, Seigel v. Truett-McConnell College*, 13 F. Supp. 2d 1335 (N.D. Ga. 1994), *aff'd* 73 F.3d 1108 (11th Cir. 1995).

BSC and its predecessor institutions were directly founded by the Methodist Church. The Methodist Church has maintained its relationship to the College until the present time. The Charter of BSC currently requires that a majority of the members of the Board Trustees be affiliated with the UMC. All of the Trustees are directly elected by United Methodist conferences. Eight of the Trustees are elected by the North Alabama Conference, and eight are elected by the Alabama-West Florida Conference. The remaining 20 trustees are elected by joint action of the two Conferences. In addition, life members of the Board may be elected by joint action of the two Conferences. A

8

majority of the current members of the Board of Trustees are affiliated with the UMC, and the current Chairman of the Board is a United Methodist minister.

Plaintiff argues that the presence of up to 49% of non-Methodists on the College's Board precludes a finding that BSC is entitled to the exemption. This misapprehends the issue. The issue is not uniformity, but control. It cannot be said that the Methodist conferences' power of direct election of the entire governing board of the institution is anything less than "substantial" control. The following passage from *Truett-McConnell* applies equally to BSC's relationship with the Alabama-West Florida and North Alabama Conferences of the United Methodist Church:

> The Georgia Baptist Convention controls through a line of accountability running from the administration to the trustees to the Georgia Baptist Convention. The College's administration must answer to the board of trustees, who have the power to hire and fire the administration. The board of trustees is accountable to the Georgia Baptist Convention, who elected and can replace them as trustees of the College. This accountability is secured within the corporate charters and bylaws . . . . The court finds that, as a matter of law, this accountability constitutes control.

13 F. Supp. 2d 1343. Likewise, the direct accountability of BSC's administration and board of trustees to the United Methodist conferences establishes substantial control as a matter of law.

There are other indicia of control, support and management present here. The College reports annually to the Boards of Higher Education of the North Alabama Conference and the Alabama-West Florida Conference of the UMC. BSC is subject to periodic reviews by a Review Committee of the University Senate of the UMC. The purpose for the review is to assess the institution's program quality, financial health, administrative effectiveness, and Church-relatedness. In 1996, the Review Committee specifically found that "Birmingham-Southern College maintains a dynamic relationship with The United Methodist Church, and the North Alabama and Alabama-West Florida Conferences in particular."

The Church's influence on the College is further shown through overlapping of the College and the conferences. The President of BSC is listed as an "Officer" of the North Alabama Conference. The North Alabama Conference refers to BSC as a "UM College." The North Alabama Conference holds its annual worship session on the campus of BSC. The headquarters of the North Alabama Conference of the UMC are located prominently on the campus of BSC, just inside the main gate of the College, in a building called "the Edward L. Norton United Methodist Center." There are two "Pastoral Advisory Boards" comprised of selected ministers from the North Alabama and Alabama-West Florida Conferences. The Pastoral Advisory Boards meet twice each year to advise the College. Members of the Pastoral Advisory Boards also agree to assist with student recruitment activities, and help to plan continuing education events for clergy members.

BSC also enjoys substantial financial support from the UMC. In addition to organized financial support from the conferences, the College receives substantial financial contributions from United Methodist congregations and members. This amount varies from year to year, and often exceeds $500,000.00. In 1997-98, contributions from the Conferences and to scholarship funds equaled $416,607. Gifts from identified Methodists and local congregations in 1997-98 amounted to $3,531,650.

Plaintiff makes two arguments that argues that this amount of financial support is not "substantial" enough to provide BSC with the § 703(e)(2) exemption. First, she says that BSC's financial support from the Methodist Church is not as substantial as the Baptist financial support for Samford University in *Killinger*. The undisputed evidence shows, however, that BSC received around four million dollars from United Methodist individuals, congregations, scholarship funds, and conferences in the 1997-1998 year. As a total, that is less than in *Killinger*, but the enrollment

10

of the institutions is vastly different. BSC has an enrollment of about 1,530 students while Samford was attended by 5,800 students. BSC's church-related financial support per student is as great or greater than the court found in *Killinger*. Based on the Eleventh Circuit's holding in *Killinger*, this court finds that four million dollars of United Methodist support is "substantial" as a matter of law. Plaintiff also argues that BSC's church-related financial support is not substantial if compared with the federal government's support of the College. In actuality, BSC <u>students</u> receive almost three million dollars from the federal government. But the students would receive assistance no matter where they attended college. BSC itself, however, receives only $65,000.00 from the federal government, over half of which is a research grant going directly to one professor, and over $20,000 of which is in energy conservation grants. That cannot negate the substantial United Methodist support of the college. *See, Siegel v. Truett-McConnell College, supra* at 1344-1335 (N.D. Ga 1994).

## CONCLUSION

The court need not make any finding whether BSC actually discriminated against Smothers on the basis of her religion, for that is precisely what she alleged. Because BSC was entitled to discriminate against plaintiff on the basis of her religion if had chosen to do so, it is not subject to suit for religious discrimination in employment. Therefore, BSC is entitled to summary judgment on that claim. A separate order granting the motion with respect to that claim will be entered.

DONE this 26 day of March, 1999.

UNITED STATES DISTRICT JUDGE